IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 27, 2024

## FRED BIRCHFIELD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Morgan County**
**No. 2010-CR-80     Jeffrey Wicks, Judge**
_____

### No. E2023-00385-CCA-R3-PC
_____

A Morgan County jury convicted the Petitioner, Fred Birchfield, of second degree murder and reckless homicide. The trial court sentenced the Petitioner to serve consecutive sentences of eighteen years for his second degree murder conviction and three years for his reckless homicide conviction. The Petitioner appealed, and this court affirmed the Petitioner's convictions. *State v. Birchfield*, No. E2016-00493-CCA-R3-CD, 2017 WL 758515, at *1 (Tenn. Crim. App. Feb. 27, 2017), *perm. app. denied* (Tenn. Jun. 7, 2017). The Petitioner timely filed a post-conviction petition, alleging that he received the ineffective assistance of counsel. After a hearing, the post-conviction court denied relief. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and MATTHEW J. WILSON, JJ., joined.

Walter Johnson, Lenoir City, Tennessee, for the appellant, Fred Birchfield.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Russell Johnson, District Attorney General; and Jonathan S. Edwards, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Procedural History and Facts
#### A. Procedural History

On September 20, 2010, a Morgan County grand jury indicted the Petitioner for two counts of second degree murder for the May 29, 2010 events that resulted in the deaths of John C. Robbins and Melissa G. Norris. After a trial, a jury convicted the Petitioner of second degree murder and reckless homicide. The trial court sentenced the Petitioner to

serve an effective sentence of twenty-one years. On direct appeal, this court affirmed the trial court's judgments, and our supreme court denied the Petitioner's application to appeal. *Id*. The Petitioner, *pro se*, timely filed a petition for post-conviction relief, and his post-conviction counsel filed an amended petition.

## B. Trial

On direct appeal, this court summarized the facts presented at trial as follows:

At the trial, the recording of a 9-1-1 call was played for the jury. In the recording, the [Petitioner] told the dispatcher that two people were dead on the road in front of his home. The [Petitioner] stated that "they" pulled their vehicle over, that "they" pulled out a .44-caliber firearm, and that the [Petitioner] shot "them." The [Petitioner] identified Mr. Robbins and referred to Ms. Norris as Blondie. The dispatcher asked the [Petitioner] to calm down.

The [Petitioner] told the 9-1-1 dispatcher that Mr. Robbins displayed a .44-caliber pistol, that the [Petitioner] "jumped out" of his vehicle, that the [Petitioner] had a .22-caliber pistol, that Mr. Robbins said he would "blow off" the [Petitioner]'s head, and that the [Petitioner] told Mr. Robbins that Mr. Robbins "did not have to do that." The [Petitioner] said that before the shooting, he pulled his vehicle beside the victims' truck because "they came down here starting some stuff." The [Petitioner] said that his hand was bleeding because Mr. Robbins shot Mr. Robbins's gun at the [Petitioner] and that the [Petitioner] "jerked" Mr. Robbins's gun out of Mr. Robbins's hand. The [Petitioner] said that after he got out of his vehicle, he told Mr. Robbins to shoot him because he would rather be shot by a friend than by someone who "snuck around [his] back." The [Petitioner] said he "just shot" the guns and did not know where the victims had been injured. The [Petitioner] stated that he fired his gun until it was empty, that he fired Mr. Robbins's .44-caliber gun until it was empty, and that afterward, he threw Mr. Robbins's gun at Mr. Robbins, who was still inside the truck.

Former Morgan County Sheriff's Deputy Rick Hamby testified that on May 29, 2010, he responded to the scene and that the [Petitioner] waved for the deputy to stop. Deputy Hamby said that the [Petitioner] showed him Mr. Robbins's truck and that the [Petitioner] reported a "gunfight" with Mr. Robbins, who was deceased inside the truck. Deputy Hamby knew Mr. Robbins and said a woman, whom the [Petitioner] referred to as Blondie, was also deceased inside the truck.

Deputy Hamby testified that although he did not question the [Petitioner] about the shooting, the [Petitioner] stated that the victims had driven by the [Petitioner]'s home several times, that the victims were cursing and yelling at the [Petitioner], and that Blondie called the [Petitioner] a "suck a--." Deputy Hamby said the [Petitioner] reported that he saw the victims turn on the road across from the [Petitioner]'s home and that a "short time" later the [Petitioner] heard three or four gunshots, which the [Petitioner] thought sounded like a .22-caliber or a .22-caliber magnum firearm. Deputy Hamby said the [Petitioner] stated that he drove to Lawrence Ellis's home just down the road and that when the [Petitioner] was driving home, the victims pulled their truck beside the [Petitioner]'s truck. The [Petitioner] said that Mr. Robbins told the [Petitioner] that the [Petitioner] owed Ms. Norris an apology and that the [Petitioner] refused and said "f--- that b----." Deputy Hamby said the [Petitioner] explained that the [Petitioner] and Mr. Robbins each admitted they were carrying guns, that the [Petitioner] got out of his truck and suggested the men be friends, that the [Petitioner] walked to Mr. Robbins's truck window, that the [Petitioner] "reached for [Mr. Robbins's] gun . . . and that it went off." Deputy Hamby said the [Petitioner] also explained that the [Petitioner] fired his gun until "it went empty" and that the [Petitioner] took Mr. Robbins's gun and fired it until it was also empty. Deputy Hamby said that the [Petitioner] stated, "I didn't mean to kill that girl, but I'm glad they're dead. I don't have to look behind me anymore."

On cross-examination, Deputy Hamby testified that he arrived at the scene around 1:00 a.m., that the [Petitioner] was cooperative, and that the [Petitioner]'s left hand was hurting, although the deputy did not examine the hand. Deputy Hamby said that the [Petitioner] did not appear to have cleaned himself.

Morgan County Sheriff's Deputy Caleb Pemberton testified that he drove the [Petitioner] to the hospital to determine his blood alcohol concentration and that during the drive, the [Petitioner] said he was "afraid of Morgan County" and feared for his life. Deputy Pemberton said the [Petitioner] explained that Mr. Robbins pulled out a gun, that the [Petitioner] shot Mr. Robbins and took Mr. Robbins's gun, and that the [Petitioner] shot Mr. Robbins again. Deputy Pemberton said that the [Petitioner] stated that before the shooting, the victims turned onto the road across from the [Petitioner]'s home, that the [Petitioner] later heard four or five gunshots that he thought came from a .22-caliber or .22-caliber magnum firearm, that the [Petitioner] had been at a friend's home when he heard the gunshots, and that

3

the [Petitioner] decided to go home after hearing the gunshots. Deputy Pemberton said that the [Petitioner] explained that during the drive home, he pulled his vehicle beside the victims' truck on the road, that Mr. Robbins pulled out a gun, that the [Petitioner] pulled out his gun and shot at Mr. Robbins, that the [Petitioner] took Mr. Robbins's gun from Mr. Robbins, and that the [Petitioner] shot Mr. Robbins with Mr. Robbins's gun. Deputy Pemberton recalled the [Petitioner]'s saying, "I won't be railroaded by [Mr. Robbins] no more. [Mr. Robbins] ran over me before[,] and I'm not going to go through that again."

On cross-examination, Deputy Pemberton testified that he did not examine the victims' truck but that he saw a gun lying inside the truck. He did not notice any cartridge casings inside the truck. He agreed the [Petitioner] was cooperative.

Morgan County Sheriff's Deputy Mike Wren testified that when he arrived at the scene, he saw a black truck parked in the middle of the road. He said the truck's lights were on, the engine was running, and the truck was in second gear but not moving. A photograph showed the front bench seat inside the truck. The photograph showed Ms. Norris on the right end of the seat, slumped toward the passenger door, and it showed Mr. Robbins in the middle of the seat slumped toward Ms. Norris. Deputy Wren said that the driver's door was not open when he arrived and that the passenger-door window was shattered. Deputy Wren knew Mr. Robbins.

Deputy Wren testified that the distance between the ground and the bottom of the driver's side window was four feet, two and one-half inches. He said that a .44-caliber magnum revolver, which was pointed toward Ms. Norris, was found on Mr. Robbins's lap and that the revolver contained cartridge casings. He said that a .22-caliber semi-automatic Ruger, which contained eleven unfired bullets, was also found inside the truck and that the firearm was found between Mr. Robbins and the center console. He noted the Ruger was not visible from the driver's door.

Deputy Wren testified that a nine-shot revolver, containing eight cartridge casings and one unfired bullet, was found inside the [Petitioner]'s truck. Deputy Wren said that forty-four .22-caliber unfired bullets were found inside the [Petitioner]'s pants pockets.

Deputy Wren testified that Mr. Robbins's truck was secured, towed, and searched. Deputy Wren said that inside the cab and the bed of the truck,

4

he found a suitcase, a twelve-pack or eighteen-pack of beer, a bottle of wine, and six to twelve marijuana plants. He said that Tennessee Bureau of Investigation (TBI) Agent Legg found a bullet lodged in the center console. Deputy Wren recalled that the medical examiner found a bottle of pills and a smoking pipe in Ms. Norris's clothes.

On cross-examination, Deputy Wren testified that the pipe found in Ms. Norris's clothes appeared to be used to smoke amphetamines and cocaine, but not necessarily marijuana. Deputy Wren agreed that he found open beer cans and a butane lighter inside the truck and that attached to a seat belt, he found a set of leg irons, which he assumed was decorative. He agreed he found boxes of bullets for the .44-caliber and .22-caliber firearms inside Mr. Robbins's truck and said the boxes were "right in front of" Mr. Robbins.

Deputy Wren testified that the [Petitioner]'s firearm was a type of gun many "older people [had] for self[-]defense." Deputy Wren said that the barrel of the firearm found between Mr. Robbins and the console was pointed toward the seat. Deputy Wren did not know if the [Petitioner] had a bloody hand at the scene. Deputy Wren agreed that Mr. Robbins was about six feet tall and weighed 175 to 180 pounds. Deputy Wren said that he found one beer can inside the [Petitioner]'s truck but that he could not determine at the scene whether the [Petitioner] was under the influence of alcohol.

Dr. Darinka Mileusnic-Polchan, an expert in forensic pathology, testified that she performed the victims' autopsies. Dr. Mileusnic-Polchan stated that Ms. Norris sustained a gunshot wound to the left eye, that the small-caliber bullet entered the brain, and that the brain was severely damaged. Dr. Mileusnic-Polchan concluded that this gunshot wound was the cause of death. She did not find any gunshot powder or soot on Ms. Norris or her clothes, leading Dr. Mileusnic-Polchan to conclude that the gun was fired more than two or three feet from Ms. Norris. Dr. Mileusnic-Polchan stated that the toxicology analysis showed the presence of methamphetamine, amphetamine, oxycodone, and Xanax.

Dr. Mileusnic-Polchan testified that Mr. Robbins suffered multiple gunshot wounds from two firearms. She stated that Mr. Robbins had five wounds from a small-caliber firearm, that one wound was inflicted at close range to the left side of the face, which fractured the left mandible, and that the bullet was recovered from the tongue. She stated that another bullet struck the left shoulder and was fired from close range based upon the amount of gun powder found on Mr. Robbins's clothes. Dr. Mileusnic-

5

Polchan said that other bullets struck the left shoulder and exited the chest, struck and exited the left arm, and struck the right hand and wrist. Dr. Mileusnic-Polchan stated that nine large-caliber bullets struck the left shoulder, left and right arm, left face, left and right chest, and abdomen. She stated that two bullets struck the abdomen and that these wounds were fatal because of damage caused to the aorta, renal artery, lumbar vertebrae, and colon. She stated that the toxicology analysis showed a blood alcohol concentration of .06% and the presence of methamphetamine, amphetamine, and oxycodone.

On cross-examination, Dr. Mileusnic-Polchan testified that Ms. Norris had healing bruises on her extremities, which were unrelated to the gunshot wounds. She agreed that the left arm showed a single bruise associated with a needle puncture and that the amount of methamphetamine in Ms. Norris's blood was high. Dr. Mileusnic-Polchan said that two glass pipes were found in Ms. Norris's clothes and that the material inside the pipes could have been methamphetamine. Dr. Mileusnic-Polchan said that she found loose oxycodone and Xanax tablets and a "pill container" with "pistol cartridges" in Ms. Norris's clothes. Dr. Mileusnic-Polchan agreed that Mr. Robbins had been drinking alcohol and had consumed methamphetamines and oxycodone near the time of his death.

Gloria Sweeten testified that Mr. Robbins was her youngest brother and that Ms. Norris, to whom she referred as Blondie, lived with Mr. Robbins. Ms. Sweeten and her husband lived on a large parcel of land, which contained a chicken house. Ms. Sweeten said that Mr. Robbins used the chicken house to work on farm equipment and vehicles, that Mr. Robbins brought his friends to the chicken house, and that she met the [Petitioner] at the chicken house. She said that she saw the [Petitioner] and Mr. Robbins together about one month before the shooting and that the men were not arguing. She said Mr. Robbins was left handed.

TBI Agent Steven Scott, an expert in forensic firearm identification, testified that he analyzed three firearms and various bullets, bullet fragments, and cartridge casings. Relative to the Ruger .22-caliber semi-automatic pistol found inside Mr. Robbins's truck, Agent Scott determined that none of the evidence matched the gun. Relative to the .22-caliber revolver found inside the [Petitioner]'s truck, Agent Scott stated that the .22-caliber cartridge casings recovered from the gun's cylinder matched the cartridge casings that were removed from the gun and submitted for analysis. Because of the damage sustained to the bullets submitted for analysis, he was unable

6

to determine conclusively whether the bullets and bullet fragments recovered from the scene and the victims were fired from the .22-caliber revolver.

Agent Scott testified that the six .44-caliber magnum cartridge casings he analyzed were fired from the .44-caliber magnum revolver found inside Mr. Robbins's truck. Relative to a bullet recovered from inside Mr. Robbins's truck, Agent Scott determined that it was fired from the .44-caliber magnum revolver. Agent Scott conclusively determined that five bullet fragments removed during Mr. Robbins's autopsy were fired from the .44-caliber magnum revolver.

On cross-examination, Agent Scott testified that he did not analyze the firearms for accuracy or range but that generally, a bullet from a .22-caliber firearm could travel up to one and one-half miles. He said, though, he did not think a person who was "lying and waiting" to kill another person would have great success from 100 yards.

TBI Agent Jason Legg testified that he assisted in the investigation after the truck had been towed to the secured impound lot. Agent Legg said that although the driver's side door did not have any bullet holes, the center console had one. Agent Legg said that Mr. Robbins was deceased at the scene and that none of Mr. Robbins's body was outside the truck. Agent Legg noted that Mr. Robbins's feet were "planted in the floor of the truck" and that the truck's location in the roadway indicated it had been traveling away from the [Petitioner]'s home.

Paramedic Patrick Sexton testified for the defense that he responded to the scene. Mr. Sexton stated that the [Petitioner] had blood on the left hand and fingers but that the blood was not from an injury. Mr. Sexton said that he saw a tear on the top of the [Petitioner]'s left hand, powder burns between the left index finger and thumb, and dark discoloration in the same area without any blood.

*Id.* at *1-4.

Based upon this evidence the jury convicted the Petitioner of second degree murder and reckless homicide. The trial court sentenced the Petitioner to serve consecutive sentences of eighteen years, as a Violent Offender, for his second degree murder conviction and three years, as a Standard Offender, for his reckless homicide conviction, for a total effective sentence of twenty-one years of incarceration. The Petitioner appealed, and this

7

court affirmed the Petitioner's convictions. *Id.* at *1. The Petitioner timely filed a post-conviction petition.

## C. Post-Conviction Hearing

As relevant to this appeal, the Petitioner maintains that Counsel was ineffective for failing to request a *Momon* hearing and failing to offer affirmative evidence to support his self-defense theory. *See Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), *on reh'g* (Mar. 30, 2000). We summarize the material evidence from the post-conviction hearing related to the issues on appeal. At the post-conviction hearing, the Petitioner testified about the allegation that Counsel coached the Petitioner not to testify and "groomed" him to remain silent, and then the trial court never made inquiries as to whether the Petitioner knew his rights. The Petitioner said that he did not testify at trial based upon Counsel's advice. The Petitioner recalled that he asked Counsel whether he should testify and Counsel responded, "no, you should not take the stand. I recommend you not, because you are going home. You are – he said I just left the meeting with the Judge."

The Petitioner agreed that Counsel advised him that he had the right to testify or not to testify and that no inferences could be drawn from the Petitioner's decision not to testify. The Petitioner said that Counsel did not review the advantages of testifying with him but that Counsel did explain the disadvantages. Counsel told the Petitioner that the disadvantage of testifying would be that the Petitioner's testimony would "harm" his case.

In furtherance of his allegation about Counsel's failure to call him as a witness, the Petitioner testified about the night of the shooting. He said he was at home with his wife and elderly neighbor, Bepo Ward. While in the yard grilling, the Petitioner heard a truck erratically driving up and down the road in front of the Petitioner's house. The occupants of the car, Mr. Robbins and Ms. Norris, would "holler stuff" as they drove by, and "spin tires." The Petitioner added that the occupants of the car cussed at him and called him names.

After eating dinner, the Petitioner and his wife drove to a nearby residence that his wife owned to check on the property. On their drive back home, the Petitioner's neighbor, Lawrence Ellis, called. The Petitioner drove to Mr. Ellis's house to speak with him. As he stood on Mr. Ellis's porch he saw tail lights on his property. He explained that he assumed the tail lights were from his "Dodge" and that his wife was preparing to drive to Mr. Ellis's house to tell him to come home. As he continued to look at the truck, he realized it was not his truck. The Petitioner observed that the truck doors were open, and he could see someone walking around the front of the truck. Concerned for the safety of his home, he left Mr. Ellis's residence and drove home. According to the Petitioner, when the victims saw him backing out of Mr. Ellis's driveway, they drove out of his yard and passed the

Petitioner on Peters Ford Road. The Petitioner could see Mr. Robbins in the truck, so he came to a stop. Mr. Robbins had passed the Petitioner's car but he backed up his truck next to the Petitioner's car. The driver's side of both vehicles were next to one another with the vehicle windows open.

The Petitioner testified that he and Mr. Robbins began talking and then Mr. Robbins said, "look down, you son of a b**ch, look down." Mr. Robbins had extended his arm out the window and was holding a pistol. Mr. Robbins said, "that's a 44-magnum, and the hammer's laid back and pointing at your G-D head." The two men then began to argue about why Mr. Robbins was on the Petitioner's property. Mr. Robbins told the Petitioner that Mark Smith had sent him to retrieve a disk, and the Petitioner told him that he did not have Mark Smith's disk on his property. Mr. Robbins responded by saying he had "a peeve" with the Petitioner's neighbor, Mr. Ellis. Mr. Robbins threatened to go to Mr. Ellis's with the gun, and the Petitioner tried to delay him.

Concerned about Mr. Ellis's safety, the Petitioner told Mr. Robbins, "let's just get out and talk about it here," and opened the truck door, inviting Mr. Robbins into his yard to talk. Mr. Robbins refused, insisting that they go to Mr. Ellis's house. The Petitioner's car began to roll, so the Petitioner sat down in his car to try to stop it when he heard "the shot." He grabbed his "22" from the passenger side of the car and began firing. He explained that he did not normally keep his gun in his car, but he did so that night because he was "expecting something." The Petitioner shot Mr. Robbins three times to "deescalate the situation"; however, Mr. Robbins was still trying to cock the pistol. The Petitioner, "in fear of [his] life," ducked behind his open car door and told Mr. Robbins to stop. He noted that he could have killed Mr. Robbins "at any time," but he did not. The Petitioner was still exposed behind the car door, so he ran to the rear of Mr. Robbins's truck.

At the rear of Mr. Robbins's truck, the Petitioner reloaded his gun and then ran toward his house. As he neared the front porch, he heard more gunfire. Feeling exposed on the porch, he ran back toward the truck to hide "between the trees" using his car "as a block." He moved behind Mr. Robbins's truck again, "with the hammer laid back," and then moved behind his car. He came "over the top of the car" and told Mr. Robbins to stop because the police were on their way.

The Petitioner testified that he approached the open truck door but denied that he opened the truck door. He recalled that Mr. Robbins was still holding the pistol. The Petitioner once again urged Mr. Robbins not to shoot. He said that he had his .22 caliber revolver against Mr. Robbins's head. He said that he could have shot Mr. Robbins between the eyes but that he did not. Instead, he grabbed Mr. Robbins's .44-caliber magnum revolver and told Mr. Robbins to let it go. He then shot Mr. Robbins in the wrist to get him to relinquish the gun. The men continued to struggle over the gun, and as the Petitioner

9

"turned the gun it went off," shooting Mr. Robbins in the stomach. The Petitioner was "shocked" and then looked over and saw Ms. Norris pointing a silver gun at him. The Petitioner said, "no, no, don't do it" and, as he backed away from the truck, he fell, and his gun fired hitting, Ms. Norris. At this point, Mr. Robbins made some type of motion, and the Petitioner began firing his .22 caliber revolver at Mr. Robbins. The Petitioner stated that he did not know that Mr. Robbins and Ms. Norris were dead. He was so frightened that he just kept shooting.

Once the police arrived, the Petitioner told Ricky Hamby and Caleb Pemberton that the victims had been in his yard. He admitted that he did not provide law enforcement with all the detail described in his testimony, explaining that he did not do so because he did not have an attorney present at the time. He recalled that he did tell Counsel the events as he had testified to them at the post-conviction hearing and that Counsel had told him he did not need to testify. The Petitioner stated that he had wanted to testify at trial because he was not the aggressor.

The Petitioner testified that Counsel did not communicate with him adequately in preparation for the trial. He said that Counsel did not answer phone calls or meet with the Petitioner. He said that he begged Counsel to hire an investigator or a gun expert and Counsel did not do so. He agreed that Counsel filed pretrial motions on his behalf but explained that Counsel only did so after months of the Petitioner and his family asking him to file those motions. Further, Counsel failed to file a motion to suppress his statements to law enforcement.

The Petitioner testified that Counsel called only one witness at trial, the EMT who treated the Petitioner's hand after the shooting. The Petitioner recalled that there was a dark discoloration on his hand that he believed was from when the pistol "went off in [his] hand." The Petitioner said that there were several people who were present at his trial to testify but that Counsel did not present their testimony. At trial, the Petitioner asked Counsel where the Petitioner's witnesses were, and Counsel said that he had dismissed them. The Petitioner maintained that he wanted the witnesses to testify on his behalf.

On cross-examination, the Petitioner testified, giving a more detailed timeline of the night of May 29, 2010, saying that he was grilling when the victims drove past his house four or five times. He finished grilling, ate dinner, and then went to check on the other property. When he got back from checking on the property, as he was approaching his front porch, Mr. Ellis called, and he went to Mr. Ellis's house. He estimated that Mr. Ellis's house was approximately 120 yards from his house. The Petitioner said he was inside Mr. Ellis's house when one of the children notified him that there was a truck at his house. The Petitioner "reluctantly" went to his car and drove home.

10

The Petitioner agreed that both he and his wife testified at his sentencing hearing. The Petitioner read aloud a portion of his testimony from the sentencing hearing when he testified that he first noticed Mr. Robbins's tail lights while seated in his car preparing to leave Mr. Ellis's house. After reading this testimony, the Petitioner stated "That's a mistake." He maintained that he first saw Mr. Robbins's tail lights from inside the Ellis house.

The Petitioner testified that he saw only Mr. Robbins and Ms. Norris in the truck. After reading aloud a portion of the transcript from the sentencing hearing that included the Petitioner's testimony that there were five people involved, the Petitioner confirmed that there were five people involved. He did not find this assertion inconsistent with his post-conviction hearing testimony.

The Petitioner testified that the shooting occurred thirty to forty feet from his house at the end of the driveway. At trial, Deputy Rick Hamby testified that the shooting occurred 75 to 100 yards away from the Petitioner's house. The Petitioner explained this discrepancy saying, that, after the shooting, the victim's truck rolled 75 to 100 yards away from his driveway because the road had an incline. When asked how the physical evidence associated with the shooting ended up in the same location as the truck, the Petitioner said that "all the evidence went down[hill] with the truck." The Petitioner maintained that the shooting occurred at his driveway before the truck and evidence rolled down the hill.

The Petitioner testified that he told Deputy Hamby about Mr. Robbins's brandishing a gun and his fear, but "[t]hey redacted all of that." The Petitioner said that he told the officers about his attempt to deescalate the situation but the officers only included "harmful things" in their testimony. The Petitioner confirmed that Deputy Hamby and Deputy Pemberton lied during their testimony and that both officers lied when they testified about his "spontaneous utterances." The Petitioner said that both officers questioned him at the crime scene.

The Petitioner denied that law enforcement found forty-four .22-cartridges in his pants pocket when they took him into custody. He explained that he had approximately sixty cartridges in his pocket, but when he was forced to sleep on the floor of the "drunk tank" twenty-two shells fell into drain on the floor. He explained that he had "dumped" the cartridges in his pocket when he felt threatened.

The Petitioner clarified his earlier testimony, stating that when he approached Mr. Robbins to take Mr. Robbins's pistol, he did not point his gun at Mr. Robbins's head but had "just had it pointed random." The Petitioner stated that he had perceived Mr. Robbins's movements after the Petitioner wrenched away the pistol to be a threat; however, in

11

retrospect, he believed Mr. Robbins's movements were because Mr. Robbins "was in his death throws."

The Petitioner agreed that he reviewed discovery at the Morgan County jail and saw photographs of the crime scene. When asked why the photographs showed the driver's side truck door shut as opposed to open as the Petitioner had testified, he explained that he had shut the car door after the shooting to allow traffic to drive through. He added that he also put Mr. Robbins's pistol back in his lap before the police arrived. When asked about law enforcement testimony at trial that the truck doors were locked upon their arrival, the Petitioner stated that he could not recall if he locked the doors or not. He then stated that Officer Legg lied when he testified that the truck doors were locked. He stated that he did not intend to kill Ms. Norris even though she was a threat and had a gun pointed at him. He said that he only fired his gun as a warning and that he did not intend to strike her.

The Petitioner agreed that the medical examiner at trial testified that Mr. Robbins sustained five small caliber wounds and nine large caliber wounds but clarified that the Morgan County Sheriff's Department was also present during the interview and might have influenced the medical examiner's findings.

Morgan County Sheriff's Department (MCSD) Deputy Rick Hamby responded to a shooting on Peters Ford Road. It was late at night and extremely foggy as Deputy Hamby approached the Petitioner's house. The Petitioner walked into the road and flagged down Deputy Hamby. Deputy Hamby recalled that the Petitioner pointed out the truck when Deputy Hamby arrived and volunteered information that Deputy Hamby documented in his notes.

Deputy Hamby testified that the Petitioner told him that the victims had been down the road at an oil well close to the Petitioner's residence and the Petitioner heard gunshots. The Petitioner was returning from a friend's house when he met the victims on the roadway. Mr. Robbins told the Petitioner that he needed to apologize "to his old lady," and the Petitioner did not agree that he owed her an apology. The Petitioner told Deputy Hamby that he told Mr. Robbins "let's be friends" and then got out of his vehicle. Mr. Robbins told the Petitioner that he had a gun, and the Petitioner responded that he also had a gun.

Deputy Hamby testified that the Petitioner told him that Mr. Robbins's truck had rolled. Deputy Hamby denied that the Petitioner had told him that Ms. Norris pointed a gun at the Petitioner. Deputy Hamby recalled that the Petitioner told Deputy Hamby that he did not mean to shoot Ms. Norris, that it was an accident.

The Petitioner approached Deputy Hamby in front of the Petitioner's house, got in the cruiser, and Deputy Hamby drove about 75 to 100 feet, "up to the truck." Deputy

Hamby recalled that the truck doors were closed, and the engine was running. He exited his cruiser, saw that both victims were dead, and went back to his cruiser to notify dispatch. Deputy Hamby described the Petitioner as compliant and "very nice." Deputy Hamby stated that, as they waited in the patrol car for a back-up officer to arrive, he did not ask any questions, he only listened to the Petitioner.

Deputy Hamby testified that the Petitioner never gave him a .44. He said there were only two guns at the scene, the Petitioner's gun and Mr. Robbins's gun. Deputy Hamby confirmed that he did not read the Petitioner his *Miranda* rights. He agreed that the Petitioner was in custody in the back of the patrol car but reiterated that he did not interrogate the Petitioner.

Counsel testified that he had practiced law for forty-one years. Counsel estimated that he had represented clients in approximately 200 criminal trials and fifty civil trials during his career. Of his 200 criminal trials, approximately twenty-five to fifty were murder trials and most involved claims of self-defense. Counsel had been a member of the Tennessee Chapter of Criminal Defense Lawyers and selected as a Super Star lawyer. At some point after his representation of the Petitioner, his license had been suspended for "deceiving clients" in civil cases. Thereafter, he was disbarred for failing to refund a fee and he did not contest the disbarment. Counsel testified that he "did everything legally and ethically [he]could to represent [the Petitioner]. The allegations [related to his suspension and disbarment] ha[d] nothing to do with [the Petitioner]."

Counsel testified that the Petitioner's brothers retained him and Brent Gray to represent the Petitioner. Counsel and Mr. Gray met with the Petitioner at the Morgan County jail and represented him at his preliminary hearing. Counsel and Mr. Gray conducted their own investigation before receiving the State's discovery by interviewing witnesses, going to the crime scene, and looking at the truck. He did so to try to anticipate what the State's case was going to be and to begin to develop a defense. Before the case went to trial in November 2011, Counsel met with the Petitioner approximately fifteen times. During the meetings, Counsel interviewed the Petitioner, reviewed discovery with the Petitioner, and obtained names of potential witnesses. When asked to estimate how many hours he worked on the case leading up to trial, Counsel said he could not estimate, but that he had "countless hours in this case."

Counsel testified that he did not discuss a client's right to testify in the early stage of representation but preferred to discuss the right to testify later in the representation. Counsel talked with the Petitioner about his right to testify and how if he chose not to testify, his decision could not be used against him. Counsel explained to the Petitioner that if he testified, contradictory statements could be used for impeachment purposes. Counsel said that he also advised the Petitioner that the ultimate decision on whether to testify was

the client's. Generally, if a client asked, Counsel would make a recommendation, but Counsel reiterated that the choice was the client's as to whether they testified. He stated that, in this case, the Petitioner chose not to testify.

Counsel testified that their discussion about the Petitioner testifying occurred in a room off the court room at the close of the State's proof. Counsel believed that the Petitioner's decision not to testify was voluntary. If the Petitioner had elected to testify, Counsel would have "let him testify." Counsel testified that, in his opinion, it would have been a mistake for the Petitioner to testify but he would not have stopped the Petitioner from so doing. He explained that, at the time, he did not think the Petitioner should testify because "he was a very volatile, loose, individual." As an example, he referenced the sentencing hearing where the Petitioner "went off" and was removed from the courtroom. Counsel did not recall the Petitioner being removed from the courtroom during a motion hearing but stated that it would not surprise him if that had occurred.

Additionally, Counsel thought the Petitioner should not testify because their theory of self-defense was established by the first two or three witnesses. There was no need for rebuttal and, "ideally," the Petitioner's testimony was going to be the same as what he had told investigators. Counsel did not believe there was anything to gain from the Petitioner testifying and that, in his opinion, the Petitioner would not have handled cross-examination well.

Counsel believed that there was evidence - the 9-1-1 phone call and his cross-examination of Deputy Hamby - supporting mutual combat or self-defense. Counsel was surprised by the jury's verdict because he believed there was sufficient evidence to establish either mutual combat, warranting a verdict of involuntary or reckless homicide, or negligent homicide, or establishing self-defense.

Counsel testified that he chose not to call one of the Petitioner's neighbors because, after interviewing the witness, he determined the testimony would be "somewhat unpredictable." In discussions with the Petitioner about the shooting, the Petitioner told him that he "got into a gunfight with [Mr. Robbins]" but that the incident was started by Mr. Robbins.

On cross-examination, Counsel reiterated that he told the Petitioner that it was his decision to make with respect to testifying at trial but that he did not think the Petitioner should testify because "it's not necessary." Counsel denied telling the Petitioner that "he was going to go home" as the Petitioner had testified. Counsel maintained that he did not think the Petitioner needed to testify and that he believed the jury decision was wrong.

14

Counsel testified that he did not request a *Momon* hearing and that he did not believe the trial court mentioned a *Momon* hearing. He testified that the Petitioner chose not to testify; however, a *Momon* hearing was not held.

Counsel identified subpoenas for Lawrence Ellis, James Godwin, Johnny Walker, and Bobby Gardner that he requested and that either he served or the Petitioner's wife served on the witnesses per his instruction. The witnesses appeared at court but given the evidence at trial, Counsel elected not to call the witnesses.

Counsel agreed that Gloria Sweeten, Mr. Robbins's sister, testified at trial that the Petitioner and Mr. Robbins had no issue with one another and that they had all been together a month prior to the shooting. Counsel did not cross-examine Ms. Sweeten because he did not find her testimony to be inconsistent with anything the Petitioner had told him.

MCSO Deputy Mike Wren testified that he arrived at the crime scene at around 2:00 a.m. where he saw a Dodge Durango truck in the middle of the road. Mr. Robbins and Ms. Norris, who had been shot and killed, were inside the truck. In Mr. Robbins's lap was a pistol. Later, law enforcement found another pistol located between Mr. Robbins and the console.

Deputy Wren estimated that the Dodge was approximately 75 to 100 yards from the Petitioner's house. About whether there was any evidence that the Dodge had rolled 75 to 100 yards from the Petitioner's driveway, Deputy Wren stated, "I don't think that would have been possible" due to a slight curve in the road that would have caused the truck to move outside the lane of travel. Additionally, at the scene, no one ever mentioned the incident as having occurred at the Petitioner's driveway and no evidence gathered at the scene indicated as much. Deputy Wren noted that the Dodge was in gear and therefore would not have rolled and the glass from the passenger window was lying on the ground next to the truck.

Deputy Wren attempted to speak to the Petitioner on two occasions and both times the Petitioner refused to speak with him. Deputy Wren confirmed that the Petitioner never spoke with him about the shooting incident. Deputy Wren agreed that he was present during the autopsy only to provide information when asked. He described himself as a "source of information" and denied that he intervened or guided the medical examiner.

After hearing the evidence, the post-conviction court found that the Petitioner failed to prove the allegations by clear and convincing evidence and denied relief. It is from this judgment that the Petitioner appeals.

15

## II. Analysis

On appeal, the Petitioner asserts that he received the ineffective assistance of counsel at trial. He maintains only two issues, that Counsel failed to: (1) request a *Momon* hearing; and (2) present a defense. The State responds that the Petitioner failed to prove that Counsel's failure to request a *Momon* hearing prejudiced his defense, and the Petitioner has failed to prove by clear and convincing evidence that Counsel failed to present a defense. We agree with the State.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the

16

"distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. *Momon* Hearing

The Petitioner argues that Counsel was ineffective because he did not request a *Momon* hearing. The Petitioner contends that had he been advised of the advantages and disadvantages of testifying, he would have testified at trial and was, therefore, prejudiced by Counsel's failure to request a *Momon* hearing. The State responds that the post-conviction court correctly found that the Petitioner was not prejudiced by Counsel's performance. We agree with the State.

Tennessee recognizes that defendants have a right to speak on their own behalf at trial. *Momon v. State*, 18 S.W. 3d 152, 161 (Tenn. 1999). Moreover, only a defendant may waive the right to testify and such a waiver may not be inferred or presumed, but instead it must be openly explored. *Id*. at 161-62. To prove that a defendant's right to testify is not violated, the defense counsel should request a hearing outside the presence of the jury to demonstrate the defendant's waiver of the right to testify has been "knowing[ly],

17

voluntar[ily], and intelligent[ly]" made. *Id*. at 162. No "particular litany" need be used; however, defense counsel must at a minimum show:

the defendant knows and understands that:

(1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

(2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

*Id*. These procedures are "prophylactic measures which are not themselves constitutionally required." *Id*. at 163.

The post-conviction court made the following findings as to this issue:

The record reflects that no *Momon* hearing was conducted on the record during the trial of this case and [Counsel] testified that he did not request a *Momon* hearing. Because defendants have a constitutional right to testify, the right must be personally waived by the defendant. . . . Therefore, pursuant to *Momon*, [Counsel] should have requested that the trial court allow him to question the Petitioner in order to ascertain whether the Petitioner knowingly, voluntarily, and intelligently waived his right to testify. . . .

This Court finds that [Counsel]'s failure to follow the well-established procedure for conducting a *Momon* hearing was deficient performance and now has to determine if the Petitioner was prejudiced by the failure to conduct a *Momon* hearing.

The Petitioner testified as follows regarding his claim that [Counsel] failed to request a *Momon* hearing and advise him of his right to testify at his trial:

18

Q    When you say under advice from [Counsel], what does that mean?

A    That he was advising me not to testify.

Q    What did he say to you?

A    He said after I said, you know, that I've had problems with him, but my life is in your hand, my life is in your hands, should I testify or not, and he said no, you should not take the stand. I recommend you not, because you are going home. You are – he said I just left the meeting with the Judge.

Q    Okay, just, let's talk about what –

A    That's what he said.

Q    When you were meeting with [Counsel] –

A    Yeah.

Q    What is he – he said to you what?

A    He said he recommended me not to testify.

Q    That you were going home?

A    Yeah, yeah.

Q    Did – when he talked to you about that, did he go over the benefits of testifying and the downsides of testifying, did he go over any kind of analysis on whether or not to testify with you?

A    Yeah, he said that you can testify if you want, he said that you can testify if you want, but I recommend you not testifying because the case has to, the Court, I mean the State has to prove and they have not got no case, they haven't got no case, you're going home.

Q    And that's what he told you?

19

A       Yeah.

\* \* \* \* \*

Q       Okay. Defendant has a right – were you advised that you have the right not to testify? Did he advise you of that?

A       Yes.

Q       He also advised you that you have the right to testify if you wanted to?

A       Yeah.

Q       So, he told you that?

A       Yeah.

Q       Did he tell you that if you don't testify, that the Court may not draw any inferences from your failure to testify?

A       I think he might have said that, yeah.

Q       Okay. So that when you don't testify, that they can't hold it against you. He told you that.

A       Yeah, I think, that's what he said.

Q       And that if you wished to testify nobody can keep you from doing it. Did he tell you that?

A       Yeah, I think he did.

Q       Well, I mean he said you can testify if you want to?

A       Yeah, that's what he said.

Q       All right now number three. Defendant has consulted with his or her counsel in making the decision whether or not to testify. Defendant has been advised of the advantages of testifying. Did he advise you of any of the advantages of testifying at trial?

20

A He said I was going home, is all.

Q Now, my question to you, was what?

A The advantages.

Q Did he explain the advantages of testifying to you?

A No, I don't believe he did.

Q All right.

In other words, that if you testify then you get this, this and this, these are the advantages of people who testify at trial –

A No, Sir.

Q - did he go over that?

A No, Sir.

* * * * *

Q All right, did he go over the disadvantages of testifying?

A Yeah, I think he said that I would – it might harm me if I testified.

[Counsel] testified as follows on direct examination regarding the claim that he failed to request a *Momon* hearing and advise [the Petitioner] of his right to testify at the trial:

Q And all those things that you talked about in terms of [the Petitioner]'s rights or not – right to testify or not to testify, did you do that with [the Petitioner]?

A Would the Court direct me to answer?

THE COURT: Yes.

21

A Yes, or yes, you're directing me to answer?

THE COURT: Yes

A Yes.

Q Okay, and ultimately, in this particular case, did [the Petitioner] make the decision to testify or not testify?

A Yes.

Q Was that as a result of you telling him not to or was that his own choice?

A It would have been his own choice, and I recall where that conversation occurred and when it occurred.

Q If you would, please tell us.

A Right there in that little room, over to the left from where I'm sitting, and behind the Officer, [the Petitioner]'s right.

Q If you recall, do you remember why he elected not to testify?

A No, I do not recall.

Q When was that conversation had, at that point?

A That conv – that particular conversation occurred while the trial was going on, at the close of the State's Proof.

Q That – you state that particular conversation, how many conversations did you have about his right to testify or not testify with him?

A I don't recall.

Q More than one?

A I don't recall.

22

Q	Understandable.

And let me make sure. . .

When he elected, and when I say he, [the Petitioner] elected not to testify, do you believe that to be a voluntary waiver, when he made that decision not to, based on your conversation with him?

A	Yes.

Q	Okay, freely?

A	Yes.

Q	If [the Petitioner] had said that he wanted to testify, what would you have done?

A	I would have let him testify. It would have been a big mistake, but I would have let him testify.

Q	And you said it would have been a big mistake, out of your experience in a lot of murder trials, why would that have been a big mistake to let [the Petitioner] testify? In your opinion of him back in 2011?

A	First of all, ordinarily, the defendant would not testify. Secondly, he wouldn't testify particularly in [the Petitioner]'s case. Third, [the Petitioner] was a very volatile, loose, individual.

Q	Okay.

When you say that what, what are you referencing at that point, when you say that? His actions in the court previously at anything, or what makes you say that?

A	In one particular instance was, he sort of went off at the sentencing hearing, which I can understand, I understand that.

Q	Yeah.

23

Do you recall, at the Motion Hearing him having to get removed from the courtroom?

A    No, I don't.

Q    Okay, if that's what has been introduced as an Exhibit, would that surprise you given Mr. –

A    No, it would not surprise me, but I do not remember that.

Q    Understand.

What else, if [the Petitioner] said he wanted to testify, why would that have been a bad idea in this particular case? You've named a couple, is there anymore?

A    Our defense was a self-defense, or mutual combat. That was all established by the first two or three witnesses. He could not have rebutted anything because he was going to testify, ideally, he was going to testify, the same as he had said to the investigators. It established either a self-defense or mutual combat. Now, I think the jury was wrong in its assessment. He was, I think, guilty of either manslaughter or one of the less[e]r homicides. I don't know how the jury reached its conclusion because, I think that there was significant evidence either to establish mutual combat, which gets a verdict of voluntary, involuntary or reckless homicide or negligent homicide, or self-defense.

Q    When you say there was a lot of evidence suggesting that it was mutual combat or self-defense, are you referencing the 9-1-1 call [the Petitioner] made that was introduced?

A    Yes, and all the . . .

Q    And, also, like your cross examination of Sergeant Rick Hamby and the facts that you elicited from him?

A    Yes.

24

Counsel testified as follows on cross examination regarding the claim that he failed to request a *Momon* hearing and advise the Petitioner of his right to testify at trial:

[Q]    So, when we were talking about, I guess when the State was talking about the trial testimony of [the Petitioner], and I believe he had a long conversation with you about the decision to testify or not to testify, is that correct?

A    Yes.

Q    And you stated that [the Petitioner] and you had a conversation over in the little room, little holding cell's [sic] what I would call it, here off the courtroom here in Morgan County, is that right?

A    Yes.

Q    Now, you were in there with him with the door closed?

A    Yes.

Q    And that's when you discussed whether you wanted – he wanted to testify or not?

A    Yes.

Q    Now, [the Petitioner] said that you told him that he could testify or not, it was his decision, is that what you told him?

A    Yes.

Q    That it was up to him whether or not he would testify?

A    Yes.

Q    And that - then he said that he asked you if you thought he should testify?

25

A    I'm sure he did.

Q    And that you told him, it wasn't necessary, that he was going to go home.

A    I – I told him it wasn't necessary for him to testify, I didn't tell him he was going home.

Q    Okay, so the only discrepancy there is, he says you told him he was going to go home, you're saying you didn't say that.

A    That's true.

Q    Okay, but you did say it's your decision to make, but I don't think you should testify, it's not necessary.

A    Yes.

Q    Okay.

So, when you had that conversation with him, and your recommendation to him was, don't testify.

A    I'm sure that that would, could be interpreted as my recommendation to him.

Q    I mean, when you say it's not necessary, I mean, and the reason was it [sic] what you stated before today, you thought he would be a loose cannon on the stand, basically.

A    You said loose cannon, I did not say –

Q    Well, I just interpreted that, I'm not, okay, well, just tell the Court what you did say, that he was volatile?

A    Yes.

Q    Okay, that he was, and what does that mean?

A    He's a loose cannon.

26

Q     Okay.

And by that, I mean, I'm not saying it's anything violent, I'm just saying that you, in your opinion, after discussions with [the Petitioner], you felt that he would not make a good witness, presentable to the jury.  Would that be fair?

A     Yes.

Q     And for that reason, you didn't think he should testify.  True?

A     True.

Q     And you didn't really think he needed to either?

A     I did not think he needed to, and to this day, I don't think he needed to.  I think the jury's decision was wrong.

Based upon the above testimony, this court finds that [Counsel] advised the Petitioner of his rights regarding this decision to testify at the trial and the Petitioner made a voluntary waiver of his right to testify upon the advice of counsel.  Having listened to the Petitioner testify for several hours during the evidentiary hearing, this court agrees with [Counsel] that the Petitioner would not make a good witness.  When the Petitioner offered his version of the events on the night of the shooting, he appeared to be adding alleged facts that did not comport with the evidence introduced at the trial in an effort to support his claim of self-defense or mutual combat.

For instance, the Petitioner testified that Mr. Robbins fired the first shot from a .44-caliber handgun at him and he returned fire with his .22-caliber pistol.  However, as stated earlier the evidence presented at trial indicated there were two weapons recovered from Mr. Robbins [sic] truck. A .22-caliber pistol that was fully loaded with eleven live rounds and a .44-caliber revolver that had been fired six times.  All six bullets from the .44-caliber revolver were recovered from the inside of Mr. Robbins'[s] truck. Five of the bullets were recovered from Mr. Robbins'[s] body and one bullet was recovered from the truck's console.  The Petitioner also testified that the shooting occurred in the road in the front of his house and Mr. Robbins'[s] truck rolled after the shooting to its final resting place about 75-100 yards away from his house.  The evidence at trial and the evidentiary hearing indicated that the shooting took place where the truck was located and it had

27

not rolled. The Petitioner testified that Ms. Norris, who was sitting in the passenger seat of the truck, was pointing a .22-caliber pistol at him and he accidentally shot her as he was falling backward. The evidence at trial indicated that the .22-caliber pistol was located between the right side of Mr. Robbins'[s] body and the truck's console. The Petitioner, in this court's opinion, claimed there was an additional .44-caliber revolver in Mr. Robbins'[s] possession to bolster his claim that Mr. Robbins shot at him first and to dispute the evidence that all six bullets from Mr. Robbins'[s] .44-caliber revolver were recovered from inside the truck. The Petitioner claims he threw one .44-caliber revolver to Deputy Rick Hamby after he arrived on the scene. Deputy Hamby disputed this assertion and this court finds that the alleged second .44-caliber revolver is a red herring used by the Petitioner to cast doubt on the evidence introduced at his trial and bolster his claim of self-defense or mutual combat. These are just a few of the Petitioner's statements this court considered in determining that the Petitioner was not a credible witness at the evidentiary hearing. Therefore, the Petitioner has failed to show by clear and convincing evidence that [Counsel]'s failure to conduct a *Momon* hearing adversely impacted his defense or deprived him of the constitutional right to testify.

The evidence does not preponderate against the post-conviction court's findings, and the Petitioner has failed to show that Counsel's failure to request a *Momon* hearing prejudiced him. The trial court found that Counsel was deficient with respect to his failure to request a *Momon* hearing, noting the well-established procedure for conducting a *Momon* hearing. The trial court then considered whether the omission of a *Momon* hearing prejudiced the Petitioner. Based upon the post-conviction hearing testimony, the trial court found that Counsel had advised the Petitioner of his rights regarding the decision to testify at trial and that the Petitioner voluntarily waived his right to testify. Further, the trial court found the Petitioner not credible during the post-conviction hearing, citing several inconsistencies in the Petitioner's testimony. The trial court also credited Counsel's testimony that he did not believe the Petitioner would handle cross-examination well. The Petitioner's testimony at the post-conviction hearing supports the trial court's finding on that issue.

Accordingly, although Counsel should have requested a *Momon* hearing after discussing the right to testify with the Petitioner, the Petitioner has failed to show that there is a reasonable probability that his testimony would have changed the outcome at trial. The Petitioner is not entitled to relief on this basis.

### B. Failure to Present a Defense

The Petitioner asserts that Counsel "wholly failed" in presenting a defense. Specifically, he argues that Counsel should have had him testify, failed to cross-examine Mr. Robbins's sister, Gloria Sweeten, and failed to call Lawrence Ellis, Charlene Birchfield, and Bobby Gardner, who were all subpoenaed and present at trial. The State responds that the Petitioner has failed to prove by clear and convincing evidence that Counsel was deficient with regard to the development of a defense theory.

## 1. Testifying at Trial

The Petitioner argues that the "primary method of proving self-defense is of course the [Petitioner] himself" and inconsistencies in the Petitioner's statements necessitated that he explain the circumstances. Without the Petitioner's explanation of his justified fear, the jury was deprived of hearing the Petitioner's reasons for acting in self-defense. The State responds that, even if it were deficient to fail to call the Petitioner as a witness, the Petitioner cannot show prejudice.

At the post-conviction hearing, the Petitioner testified that he made the decision not to testify at trial and that Counsel advised him that it was his decision whether to testify or not to testify. Counsel testified that he did not think that the Petitioner would do well under cross-examination and, after hearing the Petitioner testify, the post-conviction court agreed.

Counsel advised the Petitioner that it was not necessary for him to testify based upon the facts, testimony at trial, and the strength of the Petitioner's ability to testify in a way that would be persuasive to the jury. Counsel's advice to the Petitioner was a tactical choice based upon adequate preparation and understanding of the case. Therefore, we conclude that the Petitioner has not shown by clear and convincing evidence that Counsel was deficient in this respect or that it prejudiced him at trial. The Petitioner is not entitled to relief as to this issue.

## 2. Cross-Examination of Ms. Sweeten

The Petitioner asserts that Counsel should have cross-examined Ms. Sweeten at trial to elicit testimony about Mr. Robbins's violent nature.

At the post-conviction hearing, Counsel testified that Ms. Sweeten had testified that she had seen Mr. Robbins and the Petitioner together a month before and that the two men were friends. Counsel testified that he chose not to cross-examine Ms. Sweeten because

29

her testimony was not inconsistent with anything the Petitioner had told him. In its order denying relief, the post-conviction court made the following findings relevant to this issue:

> It is clear to this court that [Counsel] made a tactical decision to not cross examine Ms. Sweeten. This court will not second-guess a reasonably based trial strategy by the Petitioner's trial counsel. Therefore, the Petitioner has failed to show deficient performance or prejudice with regard to this issue.

Counsel's decision regarding the manner and subject matter of cross-examination "is a strategical or tactical choice, if informed and based upon adequate preparation." *Brown v. State*, No. W2021-01331-CCA-R3-PC, 2022 WL 16919956, at *8 (Tenn. Crim. App. Nov. 14, 2022) (quoting *Pierce v. State*, No. M2005-02565-CCA-R3-PC, 2007 WL 189392, at *7 (Tenn. Crim. App. Jan 23, 2007)), *perm. app. denied* (Tenn. Mar. 9, 2023). As such, "strategic decisions during cross-examination are judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time." *Reeves v. State*, No. M2004-02642-CCA-R3-PC, 2006 WL 360380, at *10 (Tenn. Crim. App. Feb. 16, 2006), *perm. app. denied* (Tenn. May 30, 2006).

When evaluating trial counsel's performance on cross-examination, the petitioner must show "what additional beneficial evidence could have been elicited" through his or her preferred cross-examination. *See Ortiz v. State*, No. M2020-01642-CCA-R3-PC, 2021 WL 5080514, at *4 (Tenn. Crim. App. Nov. 2, 2021), *perm app. denied* (Tenn. Jan. 14, 2022). This means simply that a petitioner should first provide "specifics regarding what questions trial counsel should have asked" the witness. *McDonald v. State*, No. E2016-02565-CCA-R3-PC, 2017 WL 4349453, at *4 (Tenn. Crim. App. Sept. 29, 2017), *no perm. app. filed*. In addition, the petitioner must also present that witness at the post-conviction evidentiary hearing to show how the witness would have responded to trial counsel's questioning. *See Brown*, 2022 WL 16919956, at *8; *Britt v. State*, No. W2016-00928-CCA-R3-PC, 2017 WL 1508186, *4, *7 (Tenn. Crim. App. Apr. 25, 2017), *no perm. app. filed*.

In this case, the Petitioner complains that Counsel's decision not to cross-examine Ms. Sweeten left her testimony that there was no opposition between the parties unrefuted. Additionally, "there was no effort to have this witness corroborate important details of the defense." However, the Petitioner does not identify any specific questions that trial counsel should have asked Ms. Sweeten about these areas. More importantly, the Petitioner did not present Ms. Sweeten as a witness at the post-conviction hearing. This omission is significant because, without her testimony, we cannot know how Ms. Sweeten would have answered had she been asked questions in the areas suggested by the Petitioner. Because

we may not speculate how she would have testified, and the Petitioner has the burden of proof on this issue, we conclude that the Petitioner has failed to show that he suffered prejudice from Counsel's decision not to cross-examine Ms. Sweeten. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

## 2. Failure to Call Witnesses

The Petitioner also claims that Counsel failed to call several witnesses that had been subpoenaed and were present at trial. The post-conviction court made the following findings about this claim:

> The Petitioner did not present any witnesses at the evidentiary hearing to demonstrate how those witnesses would have testified at trial. This court cannot speculate as to how these witnesses might have helped the defense. Therefore, the Petitioner has failed to show deficient performance or prejudice with regard to this issue.
>
> The court will also note that none of the Petitioner's witnesses subpoenaed to testify at the trial were eye witnesses to the events that occurred on the roadway at approximately 1:00 a.m. on May 29, 2010. These witnesses, according to the Petitioner, were present to testify as to the Petitioner's character or to support his defense of self-defense or mutual combat by revealing prior incidents of threatening behavior Mr. Robbins exhibited toward the Petitioner. In this court's opinion, none of these witnesses could support the Petitioner's claim that Mr. Robbins fired his weapon at him. As stated earlier, the evidence simply does not support this allegation. Also, none of these witnesses could refute the fact that whatever threat the Petitioner alleged he perceived from Mr. Robbins on the roadway, it ended when the Petitioner took Mr. Robbins'[s] .44-caliber revolver away from him and then shot Mr. Robbins with both his .22-caliber handgun and Mr. Robbins'[s] own .44-caliber handgun. Based on the foregoing, the [P]etitioner has failed to prove by clear and convincing evidence that [Counsel] was deficient and that he was prejudiced by this alleged deficiency.

As for Petitioner's argument that he received ineffective assistance of counsel due to his trial attorney's failure to call witnesses who could allegedly testify in support of a justification defense, we again conclude that the trial court's determination that this argument is without merit is fully supported by the record. At the post-conviction hearing, the Petitioner did not present the testimony of the witnesses in question, and trial counsel testified that the witnesses' testimony was not needed because self-defense had already

been established. We certainly cannot conclude that the failure to call these witnesses resulted in any prejudice to the Petitioner. To succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a petitioner should present that witness at the post-conviction hearing. *Black*, 794 S.W.2d at 757. Therefore, we conclude that the Petitioner has not shown by clear and convincing evidence that Counsel was deficient in this respect. The Petitioner is not entitled to relief as to this issue.

### III. Conclusion

Based on the foregoing, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE